E-FILED
Tuesday, 06 July, 2010  03:18:52 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| Thomas Moran and Carol Moran, | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | Case No. 07-1250 |
| | ) | |
| Roger D. Stratton, Terry L. Esser, Patrick | ) | |
| Parsons, and City of Peoria. | ) | |
| Defendant | ) | |

## OPINION

The parties have consented to have this case heard to judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the District Judge has referred the case to me. Now before the Court are two motions for summary judgment, one by Defendants Roger Stratton and Terry Esser (#69) and the other by Defendants Patrick Parsons and the City of Peoria (#77), and a motion to strike (#88). As explained herein, the motions for summary judgment (#69) and (#77) are granted in part and denied in part, and the motion to strike (#88) is granted.

## MOTION TO STRIKE

Defendants Stratton and Esser have filed a motion to strike Exhibits 1A, 2A, and 2B to Plaintiff's Response to the motion for summary judgment. Exhibits 1A and 2B are transcripts of recorded statements given by the two Plaintiffs to the internal affairs officer of the Peoria Police Department. These statements were given as part of the internal investigation of complaints the Plaintiffs filed with the Department following the incidents that form the basis for this case. Exhibit 2A contains seven pages of thumbnail copies of photographs.

With respect to the two recorded statements, Defendants assert that the interview transcripts

1

are inadmissible hearsay, falling within no exception. In addition, Defendants argue that they do not constitute either affidavits or depositions.

"Hearsay" is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.R.Evid. 801(c). These statements were not made at a trial or deposition, they were not made under oath, and they are offered for their truth. Rule 801(d) creates two exceptions, neither of which applies here. These statements are therefore hearsay. As such, they are generally inadmissible. Fed.R.Evid. 802. Rule 803 creates other exceptions, none of which is argued by Plaintiffs to apply.

Plaintiffs point out that each Plaintiff has filed a Declaration, averring that the recorded statement is an accurate recording of what was said and that the matters stated were true based on personal knowledge, information and belief. According to Plaintiffs, these otherwise-inadmissible statements, in conjunction with the Declarations, have been converted into something akin to an affidavit; affidavits are, of course, admissible pursuant to Rule 56(c).

No case law has been cited by either side for or against Plaintiffs' unique evidentiary proposition. Fortunately, this issue need not be resolved.. Tom Moran was deposed, and his deposition is clearly admissible. Carol too was deposed, and with respect to facts that are material to resolution of the pending summary judgment motions, she recalls nothing. Her recorded interview deals for the most part with her physical and medical problems preceding the events in question, and with the injuries she alleges resulted from the underlying events. In other words, her recorded statement adds nothing of consequence. The Court has not relied on either Plaintiffs' interview statement for any purpose.

With respect to the photographs, Defendants assert that the photos lack a proper foundation.

Rule 901 requires sufficient evidence to find that the matter in question is what its proponent claims. For photos, this evidence must show that the photo is an accurate depiction - time, place, person - of what its proponent says it is.

Tom Moran attempted to lay a foundation for the photos, but his foundation is inadequate. Based on captions and handwriting contained on the pages, some but not all photos were taken by Tom; others were taken by a professional photographer. No foundation has been laid for those not taken by Tom; he has provided no information at all about when these photos were taken, whether he was there, and if not, how he knows that they accurately depict anything pertinent. Most of the photos include no date, so determining if the photos were taken at the relevant time is impossible. Some of the captions, on the other hand, indicate that the photos were taken on several different days. See, e.g, Holbrook v. Norfolk Southern Railway Co., 414 F.3d 739 (7th Cir. 2005).

Tom's Declaration is insufficient to overcome these shortcomings. The photos are not admissible at this time. There is no harm to the Plaintiffs, because the Court found the photos immaterial to the issues presented by the pending summary judgment motions.

The motion to strike the transcripts is GRANTED because these exhibits are irrelevant to the pending motions, not because they are inadmissible hearsay. The motion to strike the photos is GRANTED for lack of foundation and for lack of relevance to the issues in the pending motions.

## SUMMARY JUDGMENT GENERALLY

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment should be entered if and only if there is no genuine issue as to any material fact, and the

moving party is entitled to judgment as a matter of law. See Jay v. Intermet Wagner Inc., 233 F.3d 1014, 1016 (7th Cir.2000); Cox v. Acme Health Serv., 55 F.3d 1304, 1308 (7th Cir. 1995).

In ruling on a summary judgment motion, the court may not weigh the evidence or resolve issues of fact; disputed facts must be left for resolution at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). The court's role in deciding the motion is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. Waldridge v. American Hoechst Corp., 24 F.3d 918, 922 (7th Cir.1994). The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial.

The court is to examine all admissible facts, viewing the entirety of the record and accepting all facts and drawing all reasonable inferences in favor of the non-movant, Erdman v. City of Ft. Atkinson, 84 F.3d 960, 961 (7th Cir. 1996); Vukadinovich v. Bd. of Sch. Trustees, 978 F.2d 403, 408 (7th Cir. 1992), cert. denied, 510 U.S. 844 (1993); Lohorn v. Michal, 913 F.2d 327, 331 (7th Cir. 1990); DeValk Lincoln-Mercury, Inc. V. Ford Motor Co., 811 F.2d 326, 329 (7th Cir. 1987); Bartman v. Allis Chalmers Corp., 799 F.2d 311, 312 (7th Cir. 1986), cert. denied, 479 U.S. 1092 (1987), and construing any doubts against the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); Trotter v. Anderson, 417 F.2d 1191 (7th Cir. 1969); Haefling v. United Parcel Serv., Inc., 169 F.3d 494, 497 (7th Cir.1999).

The existence of "some alleged factual dispute between the parties," or "some metaphysical doubt," however, does not create a genuine issue of fact. Piscione v. Ernst & Young, L.L.P., 171 F.3d 527, 532 (7th Cir.1999). "Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." McDonald v. Village of Winnetka, 371 F.3d 992, 1001 (7th Cir. 2004); see also Petts v. Rockledge Furniture, No. 07-1989, July 21, 2008 (7th Cir.). The proper

4

inquiry is whether a rational trier of fact could reasonably find for the party opposing the motion with respect to the particular issue. See, e.g., <u>Jordan v. Summers</u>, 205 F.3d 337, 342 (7th Cir.2000).

The parties must identify the evidence (i.e. those portions of the pleadings, depositions, answers to interrogatories, admissions, affidavits, and documents) that will facilitate the court's assessment. <u>Waldridge</u>, 24 F.3d at 922. Thus, as Fed.R.Civ.Proc. 56(e) makes clear, a party opposing summary judgment may not rely on the allegations of her pleadings. Rather:

> [T]he adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

See, <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). See also, Local Rule CDIL 7.1(D).

Neither the moving party nor the responding party may simply rest on allegations; those allegations must be supported by significant probative evidence. <u>First Nat'l Bank of Arizona v. Cities Serv. Co.</u>, 391 U.S. 253, 290 (1968). See also <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986)(when the moving party has met its burden, non-moving party must do more than show some "metaphysical doubt " as to material facts). A scintilla of evidence in support of the non-moving party's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [non-movant]." <u>Anderson</u>, 477 U.S. at 250.

If the undisputed facts indicate that no reasonable jury could find for the party opposing the motion, then summary judgment must be granted. <u>Hedberg v. Indiana Bell Tel. Co.</u>, 47 F.3d 928, 931 (7th Cir. 1995), citing <u>Anderson</u>, 477 U.S. at 248. If the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party and on which that party will bear the burden of proof at trial, then summary judgment is proper. <u>Celotex</u>, 477 U.S. at 322;

Waldridge, 24 F.3d at 920.

## UNDISPUTED MATERIAL FACTS

The following factual recitation is taken from the parties' statements of undisputed facts, the responses and replies thereto, and the documentary evidence submitted in support thereof. Before beginning that recitation, however, it is necessary to comment on a number of the "facts" that have been included by the parties. Many of these facts are completely irrelevant to the remaining dispute. The parties seem to have forgotten that the underlying dispute between the Plaintiffs, Thomas and Carol Moran, and former defendants, James and Shara Denson, has been resolved.

The only claims remaining are those of the Morans against Peoria police officers Terry Esser and Roger Stratton, the City of Peoria, and its Director of Human Resources, Patrick Parsons. Thus, while some general background facts about the dispute between the Morans and the Densons are necessary for context, the minute details of that dispute are not material. Hence, any dispute about those facts is not sufficient to defeat summary judgment.

Moreover, Carol Moran testified at her deposition that she did not recall much from the time Stratton arrived until she was in the paddy wagon. The parties do not rely on her testimony for any of the facts that led up to her arrest or to her treatment during the arrest. The Court therefore does the same.

The Plaintiffs, Thomas and Carol Moran, are husband and wife. The Morans lived in Peoria, Illinois from 2003 to the fall of 2006, when they moved to Pontiac, Illinois. In August of 2005, James and Shara[1] Denson and their daughter Jennifer Lanza moved into the house located on the property adjacent to the Moran's property. The Morans and the Densons disagreed about the boundary

---

[1]The complaint refers to her as Sarah, but her proper name is Shara.

between their adjacent properties. Each family commissioned surveys of the property, and the results of these surveys were inconsistent about the boundary.

The disagreement between the two families reached the point that the Peoria police were called to intervene on several occasions. Peoria Police Officer and Defendant Roger Stratton testified that he had been at the Morans' house once and the Densons' house once before this date (Dep.p.30-31). On one of the visits to the Morans', they complained about wood the Densons had piled on their property. Stratton asked the Densons to move it, and they did so.

On the second occasion where the police were involved, Peoria Police Officer Hoskins responded in early September 2005. Hoskins tried to get the parties to resolve their dispute in a face to face meeting. Thomas Moran insisted that a retaining wall was the boundary. James Denson disagreed and told Moran that he planned to tear down the retaining wall. The dispute remained at an impasse.

On one of those two occasions, the Morans showed either Stratton or Hoskins a copy of the plat of the property they had obtained. The officer - whichever one it was - told the parties that the plat did not show where on the ground the boundary was and that a survey would probably be needed.

On the crucial date, September 24, 2005, Officer Roger Stratton was the responding officer. On that date, the Denson's daughter Jennifer Lanza was attempting to erect a fence near the disputed boundary. She had used the survey commissioned by her family to figure out where the boundary was, and she staked out that boundary and marked it with a pink or orange string. Someone had removed the string, and Lanza had replaced it. Carol Moran was outside, somewhere close to the disputed boundary line. There were words between the parties, and Jennifer called the police. Stratton

7

was dispatched to meet with her.

Because Stratton had been to this location before regarding this same dispute, he was aware of the background. Upon arrival, he saw Jennifer waiting at the end of the driveway. She had a survey in her hand. He got out of his squad car and, as he began to talk to Jennifer, the two Morans started to come across the yard from their house. Carol Moran was carrying a large pair of scissors in her hand. Jennifer said something about Moran cutting her line again. Stratton yelled to Mrs. Moran to stay away from the property line, but she did not stop. Stratton headed towards her and told her that if she entered Denson's property she would be arrested. She kept going, all the way to the string, which she then cut with the scissors. Stratton announced that she was under arrest for trespassing.[2]

According to Stratton (who is 6 feet tall and weighed about 225 pounds), he then attempted to handcuff Carol Moran (who is 5'2"; estimates as to her weight range from 220 to 270 pounds). He put one cuff on her right wrist and took the scissors from her hand, dropping them to the ground. Carol started to struggle. As Stratton tried to pull her right hand behind her back to finish handcuffing her, Carol continued to turn in such a way that he could not do so, so he moved towards the retaining wall to prevent her from turning. He was then successful in handcuffing her in less than one minute. Then he walked her to his squad car. At some point, he also called for backup.

While this was going on, Thomas Moran was present. According to Stratton, he was in the

_____

[2]Stratton recalls that he told her to stay away from the property line and/or not to cut the string, and also that if she did not comply she would be arrested. The Complaint specifically alleges that "Officer Stratton instructed Moran not to use the scissors." In light of Stratton's undisputed testimony that he told her not to use the scissors and the undisputed testimony that she used them despite the warning, paired with Carol's lack of memory and the allegation in the complaint, I find that, for purposes of this motion, the statements discussed in this paragraph are the statements made by Officer Stratton at the time.

8

back yard but would come and go. As Stratton began walking Carol Moran to the squad car, Thomas took up a position directly in their path. He was snapping photos, wanting Stratton's badge number, and saying that he was going to complain and sue. Stratton told him to move 3 times and threatened him with arrest for obstructing before Thomas complied.

When Stratton and Carol Moran got to the squad car, Carol refused to get in. She said something to Stratton about major surgery she had just had, and saying that he was hurting her[3]. She yelled that she was not going to sit in the car, and that she wanted a sergeant and wanted to see a lawyer. Stratton[4] called for a paddy wagon, and they waited. The backup car, driven by Officer Grow arrived, and the paddy wagon, driven by Officer Esser, arrived shortly thereafter.

When a handcuffed person is going to be placed into a paddy wagon, custody is exchanged between the arresting officer and the officer driving the wagon. The handcuffs are exchanged so the arresting officer can have his cuffs back. Esser (who is 6' tall and weighed 295 pounds) told Carol Moran several times to turn around and face the squad car; she refused and after several requests, he physically turned her. Carol kept trying to turn around and, according to both Esser and Stratton, was kicking at Esser and at Officer Grow (who is 5'10" and weighted around 180 pounds). In order to exchange the handcuffs, Esser held one of her arms and Officer Grow the other. When they asked her to walk to the paddy wagon, she refused. She was told to stop resisting so they could put her in the wagon safely, but she continued to kick at the officers and pull away from them.

---

[3]Carol Moran suffers from several chronic conditions, including scleroderma and lupus. These medical problems are not, however, material, because neither Stratton nor Esser was aware of them. All Stratton knew was what Carol told him, namely that she had had surgery recently.

[4]At some point, Shara Denson also went inside, where she called 911 and requested that another officer be sent.

Esser then used a control tactic he refers to as a "rear wrist lock." It involves applying pressure to the elbow of a person whose arms are handcuffed behind the back. It is a pain compliance technique: when the person complies, the pain is removed. Carol complained that it hurt, and Esser told her the pain would stop if she would quit resisting. Eventually she stopped resisting, and the officers tried to put her in the smaller of three compartments in the paddy wagon. They told her numerous times to step up on the steps into the wagon but she would not comply. Grow and Esser still were holding her arms; they each grabbed her shorts with their free hands, lifting her up and standing her on the first step so she was facing the wagon. She stood there, then moved up to the top. When she reached the top she stopped. Esser, who had walked up the steps with her, holding her arm, explained that she needed to step in and sit down. Instead, Carol "either put herself on her knees or fell to her knees." Esser was adamant that he did not push her.

Once on her knees, Carol was fully within the compartment, although not on the seat. Esser closed the door. Carol was complaining that her knees hurt and asking to have the handcuffs removed. Esser waited outside the compartment while Stratton completed the paperwork necessary for transport to the jail. After awhile, he opened the compartment door, and she said that she wanted to talk to a sergeant and that she wanted medical care because she was hurt. He asked if she was ready to sit on the seat, and she replied affirmatively. Because she needed her hands to do that, he removed the handcuffs. Once she was seated, the handcuffs were placed back on her wrist.

While all that was going on, Sergeant Fisher arrived. He spoke to Carol for a few minutes. Carol told him that she had had surgery and was in pain and wanted medical treatment. Esser then shut the doors to the paddy wagon. Fisher told him to take her to the hospital. At first, he was told to take her to OSF St. Francis but that order was changed to Methodist Medical Center because of

10

a contract between the City and Methodist.

Esser drove to Methodist Medical Center emergency room. When he arrived, Officer Mike Johnson was there. When Esser tried to assist her out of the wagon, she told him to keep his hands off of her, that she could get down herself. Esser refused, stating he would help her till she was on the ground so she would not fall. Although Carol did not like the idea of Esser holding on to her arm, she did not resist. Someone from the hospital came out with a wheel chair. Johnson went into the hospital with her, and Esser returned to the police station.

Shara Denson and Jennifer Lanza both testified in a manner consistent with the testimony of Officers Stratton and Esser. Carol Moran testified that she remembered nothing from the time her arm was twisted behind her back until the time she was placed in the paddy wagon. Thomas Moran, however, recalled the events, and he related an entirely different story than the other witnesses with recall.

According to Thomas, he had received a copy of the survey they had commissioned that day and had made copies of it. He and Carol were in the yard, and he was taking pictures of the Densons digging up bushes that, according to that survey, were on the Moran's property. Carol went out with scissors and a ruler in her hand, with the intent to cut the pink string that the Denson's had strung.

When Stratton arrived, he ran up to Carol, grabbed her hand (or her finger), twisted her arm behind her back, and threw her against the retaining wall. Thomas states that he then went inside and called the police. He was inside for about 10 minutes. When he came back out, he believed that there were at least 4 police cars with about six officers present.

At some point in time, either Carol or Thomas gave Stratton a copy of the survey. While Stratton and Carol were proceeding towards the squad car, Thomas said, "You've got the survey, why

11

don't you read that?" Thomas claims that Stratton replied, "They're ministers. They won't lie. This is their land." He then crumpled the copy of the survey and threw it on the ground. Thomas testified that Carol did not voluntarily walk to the police car but "was crying and she was dragged" and that she did not climb into the vehicle of her own volition. At some point, he yelled at Stratton to leave her alone. At this time, Thomas also went back inside to call the police again. Thomas also testified that, at some point in time, Stratton came running at him and hit him on the left shoulder, saying that if he didn't shut up, he would go to jail too.

When Sgt. Fisher arrived, he and Thomas went in the house to talk. Thomas recalls that Sgt. Fisher told him his wife had been arrested, and that she was going to OSF. They also discussed an attorney who had some years earlier helped Fisher with a land dispute.

On September 25, Thomas and Carol went to the Peoria Police station; each of them submitted a complaint against Officers Stratton and Johnson. Their complaints were referred for investigation to an Internal Affairs Officer, Sergeant Hlavacek. He interviewed Carol Moran. He determined neither complaint had merit. Hlavacec's investigation and findings were reviewed and approved by Chief of Police Settingsgaard.

On that same date, Thomas Moran contacted the Peoria police department, asking for an officer to respond to the renewed trespass by the Densons on the Moran property. He was referred to a lieutenant, who told him that as long as he had a complaint against the Department, he would do nothing about the Denson's conduct.

At the time, the City's Director of Human Resources was Patrick Parsons. He was responsible for City personnel as part of his job. His decisions were reviewable by the City Manager and could be approved or changed by the City Manager.

At the time the City had a contractual arrangement with OSF for occupational health. This contract required OSF to provide occupational medicine service for the City, ensuring that there were occupational medicine physicians available in worker's compensation cases. OSF made assessment of City employees for the City, but those employees were allowed to receive treatment at any facility and from any provider they desired. One aspect of Parson's job was to review monthly any ongoing cases with OSF physicians; this review was usually led by Dr. Pena.

At the same time, the preferred provider for non-work-related injuries was Methodist Medical Center.

Thomas Moran was a physician's assistant. He is employed by OSF Occupational Medicine. His job duties included performing physical examinations, and to assist physicians in various ways. As such, he often saw Peoria police officers with worker's compensation claims against the City.

On September 26, Parsons was informed by a representative of the Peoria Police Benevolent Association that Carol Moran had been arrested, and that the arrest was the result of a conflict between both of the Morans and police officers. The representative explained that officers had told him[5] that Thomas Moran would be biased against any officers he saw. In addition, the representative suggested that this conflict could cost the City because officers could make arguments to the

---

[5]Plaintiffs admit that the representative told Parsons this but object that the source of the statement is therefore irrelevant and also assert that the statement of the representative is inadmissible hearsay. Whether the officers actually told the representative this is immaterial; the representative's statement is offered to explain Parsons' actions after he heard the statement. Because it is not offered for its truth, it is not hearsay. I further disagree that who told the representative about the officers' concerns or who told Parsons about those concerns is irrelevant simply because Plaintiff admits that someone told Parsons. The admission means that Defendant need not prove that the officers told the representative about their concerns or that the representative is the one who talked to Parsons; it does not make the source of any statement irrelevant.

Industrial Commission that Moran's testimony was unreliable due to this conflict.[6] Parsons told the representative that he agreed and that he would contact OSF and relay those concerns.

Parsons contacted Dr. William Scott, the medical director for Occupational Health at OSF. Dr. Scott supervised Thomas Moran and other physicians' assistants. Parsons told Dr. Scott that the Benevolent had stated they did not want to be examined or treated by Moran due to a conflict of interest. Parsons says he gave no details about the conflict, although the complaint alleges that it was due to the pending complaint Moran had against Stratton and Esser. Parsons expressed his opinion that Moran should not see or treat police officers for the time being. Scott assured Parsons he would take care of this.

Thomas Moran was angry and upset and told a lot of people about the events that had led up to Carol's arrest. He had complained more than once to Scott and others in the office about the arrest. Scott, therefore, thought there was a conflict of interest. Scott directed Moran not to see Peoria police officers and instructing staff that Moran was not to have appointments with Peoria Police officers, although he gave no reason for that instruction. Scott was aware of other occasions in which other clients had made similar requests, and he saw nothing unusual in the request by Parsons.

A substantial part of Moran's practice was treatment of Peoria police officers. Elimination of Peoria police officers from his work load significantly limited his practice and was a factor in his decision to leave Peoria OSF and move to OSF in Pontiac[7].

---

[6]Plaintiffs object to this statement arguing that Moran's statements would not be admissible in any worker's compensation proceeding. This may be true, but it does not make the statement by the representative to Parsons inadmissible.

[7]Defendants assert that the facts in this paragraph are immaterial to the Plaintiff's prima facie case of retaliation. Substantively, that is true; they relate to other issues, such as causation and damages, that are not part of the pending motion. For purposes of context, however, they are include in this recitation of facts.

Eventually, Carol Moran pled guilty to knowingly resisting the performance of Stratton in his job duties and to assault when entering the paddy wagon.

### THE COMPLAINT

Carol Moran alleges that the conduct of Stratton and Esser[8] violated the Fourth Amendment's proscription against unreasonable searches and seizures, and that the City ratified that misconduct by Settingsgaard's approval of the internal affairs investigation of her complaint. Settingsgaard is alleged to be a policy making agent for the City. She also alleges that the City has a policy of deliberate indifference to deprivation of Fourth Amendment rights by police officers and that this policy was a moving factor in the deprivation of her rights.

Thomas Moran alleges that Parson's conduct violated his right to free speech and to petition the government and to substantive and procedural due process. Parsons is alleged to be a policy making agent for the City.

### DISCUSSION

FALSE ARREST

Stratton challenges Carol Moran's false arrest claims against him, arguing that the claim against him fails because he had probable cause to arrest Carol and, even if that were not the case, he is entitled to qualified immunity.

Probable cause is an absolute defense to a claim of wrongful arrest asserted under section 1983 against police officers. Williams v. Rodriguez, 509 F.3d 392, 398 (7th Cir. 2007); Wagner v. Washington County, 493 F.3d 833, 836 (7th Cir. 2007) (per curiam). A police officer has probable cause to arrest "if, at the time of the arrest, the 'facts and circumstances within the officer's

---

[8]The claims against Johnson, Larson and Settingsgaard were dismissed with prejudice by Plaintiff on January 13, 2010. See Motion (Doc. #73) and Order (Doc. #74).

knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.' " Id at 836 (quoting Michigan v. DeFillippo, 443 U.S. 31, 37 (1979); see also Beck v. Ohio, 379 U.S. 89, 90 (1964); Maxwell v. City of Indianapolis, 998 F.2d 431, 434 (7th Cir. 1993).

In determining whether an officer had probable cause, the court steps into the shoes of a reasonable person in the position of the officer. Mustafa v. City of Chicago, 442 F.3d 544, 547 (7th Cir. 2006) ( probable cause is evaluated 'not on the facts as an omniscient observer would perceive them,' but rather 'as they would have appeared to a reasonable person in the position of the arresting officer' "). "If the underlying facts supporting the probable cause determination are not in dispute, the court can decide whether probable cause exists." Maxwell, 998 F.2d at 434. On the other hand, if the facts are in dispute or if there is room for a difference of opinion regarding reasonable inferences that might be drawn from those fact, then the probable cause determination must go to the jury. Id.

When Stratton announced that Carol was under arrest, it was for trespass. Under Illinois law, the elements of a claim of trespass are that a person (1) knowingly and without lawful authority enters or remains within or on a building; or (2) enters upon the land of another, after receiving, prior to such entry, notice from the owner or occupant that such entry is forbidden; or (3) remains upon the land of another, after receiving notice from the owner or occupant to depart. 720 ilcs 5/21-3 (2004).

Plaintiff asserts that a jury could conclude that Stratton deliberately disregarded the survey the Morans tried to get him to look at. If he had looked at it, he would have been able to determine that the Morans were right and the Densons were wrong, and Carol never would have been arrested for trespass because he would have known she was on her own land.

16

The fundamental flaw in Plaintiff's reasoning is the assumption that police bear the responsibility for determining ownership of disputed property. In <u>Kelley v. Myler</u>, 149 F.3d 641 (7th Cir. 1998), the plaintiff made a similar claim, namely that probable cause to arrest for trespass did not exist because the police had not checked official records to determine property boundaries. The Seventh Circuit declined "to add this extra requirement to the probable cause determination." It is not necessary for an officer to establish cause on every element of a crime; the inquiry is whether there are reasonable grounds on which to act, not on whether it was reasonable to conduct a further investigation before making an arrest. Id. at 646-7. "Certainly we cannot expect our police officers to carry surveying equipment and a Decennial Digest on patrol; they cannot be held to a title-searcher's knowledge of metes and bounds..." <u>Id.</u> at 647, quoting <u>Bodzin v. City of Dallas</u>, 768 F.2d 722 (5th Cir. 1985).

Other flaws exist as well. What Carol was ultimately charged with or pled guilty to is irrelevant to the question whether there was probable cause to make the initial arrest. See <u>Holmes v Village of Hoffman Estates</u>, 511 F.3d 673, 682 (7th Cir. 2007)(probable cause to believe plaintiff committed *any* crime precludes false arrest claim, even if arrestee was later charged with a different crime.). If there was probable cause to arrest Carol for any crime, then regardless of Stratton's subjective reason for making the arrest the false arrest claim fails. <u>Devenpeck v. Alford</u>, 543 U.S. 146, 163 (2004)(subjective reason for making an arrest need not be the criminal offense as to which the known facts provide probable cause.).

As Defendants point out, Carol's conduct could reasonably be seen as violating law other than state trespass law, such as Illinois law which makes it a crime to "knowingly damage the property of another." 720 ILCS 5/21-1. Peoria's City Code makes it an offense to resist a police officer in the discharge of his duty or to interfere with a police officers discharge of duty. Section 24-

17

39.     Here, Stratton was indisputably aware that these parties disagreed about the line separating their property. It was not up to him to decide where the line was. He warned Carol to stay away from the disputed line and he warned her that she would be arrested if she did not. She did not comply; in fact, she defiantly used the scissors in her hand to commit what could reasonably be viewed as a trespass or as damage to property that might well have been Densons' property. At the least, it was not unreasonable for Stratton to have concluded that Carol had committed or was about to commit a criminal offense. See U.S. v. Kincaid, 212 F.3d 1025, 1029 (7th Cir. 2000)(in evaluating probable cause, the issue is not whether the defendant actually entered the property but whether the officer reasonably believed that he did.); People v. Wetherbe, 462 N.E.2d 1,4 (Ill.App.1984)(despite the fact that defendant could not be prosecuted for trespass, the arrest was valid because a reasonable person under the circumstances could believe that the defendant had trespassed.).

        Another flaw in Plaintiffs' argument is the partial reliance on Judge Mihm's Order (Doc. #27) on the Rule 12(b)(6) motions which discussed the law of trespass and how it applies in this case. What Plaintiffs forget is that the Order in question assumed the accuracy of the allegations of the complaint. In the instant motion, Plaintiff must point to evidence that supports his claim; he cannot simply rely on pleadings. Fed.R.Civ.Proc. 56(e); Local Rule CDIL 7.1(D). See, Bordelon v. Chicago Sch. Reform Bd. of Trustees, 233 F.3d 524 (7th Cir. 2000)(party opposing summary judgment must do more than rely on allegations; he must support those allegations with evidence); Wade v. Byles, 83 F.3d 902 (7th Cir. 1996)(party opposing summary judgment may not rely on pleadings but must "affirmatively demonstrate a genuine issue of material fact).

        Finally, it is worth noting that this is not a case where a police officer arrested someone for nothing more than words. It is undisputed that Carol Moran did more than speak or argue. She performed an affirmative act knowing that he was a police officer and after he had told her directly

to stay back, and she did so in such a defiant and hostile manner that the confrontational situation confronting Stratton was exacerbated. Her arguments that she was wrongfully arrested conveniently ignore her own role in the events of that September day.

I therefore conclude that probable cause existed for Stratton to arrest Carol. Even if I were to have concluded that this issue raised a question of fact, however, I would nonetheless grant Stratton's motion because he is entitled to qualified immunity. Qualified immunity protects police officers from liability under § 1983 so long as their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would haven known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity allows for mistaken judgment, protecting "all but the plainly incompetent or those who knowingly violate the law." Hunter v. Bryant, 502 U.S. 224, 229 (1991).

In assessing qualified immunity, a court must generally undertake a two-step evaluation. First it must determine whether the facts, taken in the light most favorable to the plaintiff, demonstrate that defendant's actions amounted to a violation of a federal right. Saucier v. Katz, 533 U.S. 194, 200-01, (2001)). If such a violation has taken place, the court must determine whether that right was "clearly established." Id.. The plaintiff bears the burden on both questions. Erwin v. Daley, 92 F.3d 521 (7th Cir. 1996).

So assuming *arguendo* a lack of probable cause in this instance[9], the Plaintiffs bear the burden of directing the Court to statutes or case law showing that law on this question was clearly established. This can be done in one of two ways: by citation to a case that has established not just the right in question but also its application to a factual situation "closely analogous" to the facts

---

[9] Under Pearson v. Callahan, - U.S. -, 129 S. Ct. 808 (2009), it is permissible to skip directly to the second question

before the Court; or by showing that the violation was so obvious that a reasonable person would necessarily have known about it. Id. at 525.

Plaintiffs have brought to the Court's attention not one single case in which probable cause was found lacking in a property line dispute even remotely analogous to the facts confronting Stratton. To the extent that case law exists, it is contrary to Plaintiffs' position. Nor can it reasonably be said that the violation alleged by Carol was so glaringly obvious that Stratton should have known better. In this case, Stratton is without question entitled to qualified immunity for his arrest of Carol Moran.

Either because the arrest was based on probable cause or because Stratton is entitled to qualified immunity, his motion for summary judgment on the false arrest claim is GRANTED.

EXCESSIVE FORCE

Carol Moran also has claims of excessive force against both Stratton and Esser, and both officers challenge these claims arguing that the evidence produced by Plaintiff is insufficient to create a genuine issue of material fact. Alternatively, the officers once again assert that they are entitled to qualified immunity.

An officer who has the right to arrest someone has the right to use the degree of force reasonably necessary to effectuate the arrest. Graham v. Connor, 490 U.S. 386, 396 (1989). The force used to effect an arrest must be objectively "reasonable" under the Fourth Amendment. Abdullahi v. City of Madison, 423 F.3d 763, 768 (7th Cir. 2005). To determine whether the force used to effect an arrest was reasonable the courts must engage in a "careful balanc[ing] of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Morfin v. City of E. Chicago, 349 F.3d 989, 1004 (7th Cir. 2003) (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)). This balancing test "requires careful attention

20

to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 1004-05 (citing Bell v. Wolfish, 441 U.S. 520, 559 (1979)).

The reasonableness standard also recognizes that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97. In sum, an officer's "use of force is unconstitutional if, 'judging from the totality of the circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest.'" Payne v. Pauley, 337 F.3d 767, 778 (7th Cir. 2003) (quoting Lester v. City of Chicago, 830 F.2d 706, 713 (7th Cir. 1987)).

In this case, the crime at issue was relatively minor. Some level of threat might have been perceived by the fact that Carol had scissors in her hand, although that threat was certainly dissipated when she dropped the scissors after cutting the tape. Defendants focus the Court's attention on Carol's lack of compliance and active resistance to her arrest.

Despite the best efforts of Stratton and Esser to characterize the facts in such a way that the force used on Carol would be seen as reasonable, however, I must conclude that, with respect to Stratton, there are too many material facts in dispute to conclude as a matter of law that the force he used was reasonable. Tom Moran testified that Stratton "threw her" against the retaining wall, while Stratton testified that he used the retaining wall as leverage in his efforts to handcuff her. While Carol does not dispute her failure to comply with Stratton's orders or to go willingly with Stratton to the police vehicle, the level and degree of her resistance is described differently by Tom Moran than by other witnesses.

21

In other words, both the level of force Stratton used and the degree of resistance by Carol are in dispute. It is therefore impossible to balance those two factors without resolving the disputed facts. And without resolving those factual disputes, it cannot be said that Stratton's use of force was objectively reasonable.

The question is somewhat different for Esser. There is not a lot of dispute about what he did in his efforts to get Carol into the paddy wagon and to secure her there, and there is similarly not a significant dispute about what she did either. Rather, the dispute with respect to Esser revolves around the inferences that can be fairly drawn from those facts. At the summary judgment stage, any inferences that must be drawn are to be drawn in favor of the non-moving party. Adickes, 398 U.S. at 157. That general rule, as well as questions that remain about the totality of circumstances that led up to Esser's involvement in these events, lead me to an inevitable conclusion: it would be improper to draw an inference that, as a matter of law, Esser's use of force was reasonable.

The motion for summary judgment as to the excessive force claims against Stratton and Esser is DENIED.

### FIRST AMENDMENT CLAIMS AGAINST PARSONS AND THE CITY

Plaintiffs raise several First Amendment claims. Against Parsons, Plaintiffs assert that he retaliated against Tom Moran for his exercise of constitutionally protected speech and that he violated Tom and Carol's right to petition the government for redress of grievances. Plaintiffs also assert that Parsons' conduct is attributable to the City on the grounds that Parsons was a final decision-maker.

Parsons challenges the retaliation claim substantively, and asserts that he is entitled to qualified immunity as to the claim for violation of the right to petition the government for redress of

grievances. The City argues that it cannot be held liable for Parsons' conduct because he was not a final decision-maker.

RETALIATION

To prevail on a First Amendment retaliation claim, a plaintiff must show (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendant's decision to retaliate. Mt. Healthy City Sch. Distr. Bd of Educ. v. Doyle, 429 U.S. 274, 287 (1977); Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009); Woodruff v. Mason, 542 F.3d 545, 551 (7th Cir. 2008).

If plaintiff can establish the first two prongs, the burden shifts to the defendant to prove by a preponderance of the evidence the same action would have been taken regardless of the protected speech. Mt. Healthy, 429 U.S. at 287; Vukadinovich v. Board of School Trustees of North Newton School Corp. 278 F.3d 693, 699 (7th Cir. 2002). If the defendant carries that burden, plaintiff then bears the burden to show that the defendants' proffered reasons were pretextual and that the real reason for the defendants' wrongful conduct was constitutionally impermissible. See, e.g., id. In the summary judgment context, this means that plaintiff has to show that a rational finder of fact could infer that the defendants' stated reasons for the conduct were lies. See, e.g., id.

Analysis of a First Amendment claim that the government retaliated against a person who exercised free speech rights is highly fact specific, and the formulations of the elements of such claims reflect those factual differences. Compare Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274 (1977)(governmental employee plaintiff); Bridges v. Gilbert 557 F.3d 541, 546 (7th Cir. 2009)(prison inmate plaintiff); Bd, of County Com'rs. v. Umbehr, 518 U.S. 668, 685 (1996) (independent contractor plaintiff).

Defendant relies solely on cases in the employment context. The specific language of those cases does not fit well in this case, where the speaker was not a City employee but rather an employee of a contractor with an existing contractual relationship with the City. The parties have pointed the Court to no case in which the plaintiff was an employee of an independent contractor who lost his job with the contractor due to his own speech. After reviewing the above cited cases and others, I find that the analysis in <u>Umbehr</u> seems most helpful and best suited for this situation.

In <u>Umbehr</u>, the County declined to renew a trash hauling contract with the Plaintiff, an independent contractor. He sued two members of the Board of County Commissioners, asserting that his criticism of the County and its Board had motivated the non-renewal. The District Court granted summary judgment to the defendants, finding no first amendment protection for independent contractors. The Tenth Circuit Court of Appeals reversed. The Supreme Court held that the First Amendment does provide some protection to independent contractors from retaliation for their exercise of constitutionally protected speech.

The <u>Umbeh</u>r Court explained that an independent contractor must show that the termination of his contract was motivated by his speech on a matter of public concern, "an initial showing that requires him to prove more than the mere fact that he criticized the [governmental body] before" the governmental body took action. If the contractor makes that showing, the governmental body will have a "valid defense" if it can show by a preponderance of the evidence either (1) that, "in light of their knowledge, perceptions, and policies at the time of the termination, the Board members would have terminated the contract regardless of his speech;" or (2) that "the County's legitimate interests as contractor, deferentially viewed, outweigh the free speech interests at stake." <u>Id.</u> at 686.

In the case before this Court, Plaintiffs have produced evidence of nothing other than that Parsons took action after they criticized the police officers. Under <u>Umbehr</u>, that is not enough to

make the requisite initial showing.

Moreover, the fact that Parsons took action after the Moran's complaint does not necessarily make his action retaliatory.  The undisputed evidence is that Parson's action was motivated not by the Morans' protected speech but rather by the concerns of the Benevolent.  There is no evidence that Parsons contemplated taking any action involving Tom Moran at all, prior to Parsons' conversation with the Benevolent representative. Without that conversation, Parsons had no motivation at all to take any action.  His action was, therefore, not motivated by the Morans' speech. Only the Plaintiffs' speculation is offered to challenge Parsons' explanation, and that is far from enough to create a cognizable issue of fact.

For these reasons, the Plaintiffs have failed to meet their evidentiary burden.  The motion for summary judgment on the First Amendment retaliation claim is therefore GRANTED.


PETITION FOR REDRESS OF GRIEVANCES

Tom Moran's next claim is that his right to petition the government was violated by Parsons' interference with his job. The right to petition the government for redress of grievances is a right that extends to all departments of the government, including agencies such as police departments. California Transport v. Trucking Unlimited, 404 U.S. 508, 510 (1972). See also Gable v. Lewis, 201 F.3d 769 (6th Cir. 2000).

Parsons argues that he is entitled to summary judgment on the basis of qualified immunity because there is no factually analogous case about the right to petition the government. When qualified immunity is raised as a defense, the court is presented with two questions: whether the alleged misconduct violates a constitutional right at all, and if so, whether the defendant's actions were objectively reasonable in light of then-prevailing standards. Siegert v. Gilley, 500 U.S. 226, 232

(1991). A negative answer to either question dooms the plaintiff's claim. Id.. See Pearson v. Callahan, - U.S. -, 129 S.Ct. 808, 818 (2009).

It is not necessary to consider the first element before the second. In Pearson, the Supreme Court renounced prior law that mandated otherwise. 129 S. Ct. at 818. It is now proper to proceed directly to the second question, namely whether there was clearly established law at the time of the official's conduct.

Once the defense of immunity is raised, the plaintiff bears the burden of establishing the existence of a clearly established constitutional right implicated by the alleged misconduct. Rice v. Burks, 999 F.2d 1172, 1174 (7th Cir. 1993). Broad propositions of law do not suffice:

> The right the official is alleged to have violated must have been established in a more particular, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

Brosseau v. Haugen, 543 U.S. 194, 198 (2004). See also, Chan v. Wodnicki, 123 F.3d 1005, 1008 (7th Cir. 1997)(plaintiff must point to a reasonably analogous case that has not only articulated the right in question but has also applied it to a factual circumstance similar to the one before the court, unless the violation was so obvious that a reasonable person necessarily would have recognized it as a violation of the law).

Because this inquiry focuses on the objective reasonableness of the action, the state of mind or good faith of the official is not material. Chan, 123 F.3d at 1008, citing Anderson v. Creighton, 483 U.S. 635, 638 (1987). It applies "regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson 129 S. Ct. at 815. Qualified immunity bars suits for damages against "all but the plainly incompetent

or those who knowingly violate the law." <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986).

How might this case have been different if Parsons had learned of Moran's complaint from a source other than the Benevolent? When one considers the possible answers to that question, it becomes apparent that the source of Parsons' information is the key fact in the qualified immunity analysis. Had the information about Moran's complaint come from some general community source or even from Moran himself, there would have been no reasonable basis for Parsons to act at all. Under that scenario, Parsons' call to Dr. Scott would have easily and reasonably raised an inference of suspicious and prohibited motivation, an inference sufficient to defeat qualified immunity. But because the information came from the Benevolent, the information could not reasonably be ignored; without action, the potential for significant and negative impact on the City could reasonably be foreseen. Even if Parsons was mistaken about the ramifications of a failure to act, it was neither incompetent for him to have acted nor blatantly obvious that his action might violate clearly established First Amendment rights.

Plaintiff has referred the Court to no case that includes the type of dilemma facing Parsons after his conversation with the union representative. The only cases cited paint with a broad brush the right to petition. Plaintiff has failed to meet his burden, and Parsons is therefore entitled to qualified immunity as to this claim and summary judgment is GRANTED.

PARSONS AS POLICYMAKER

The City also challenges Plaintiffs' assertion that it can be liable for Parsons' actions. It is black letter law that a municipality is not liable for the acts of its employees simply by virtue of being their employer. <u>Monell v. Dept of Social Svcs</u>., 436 U.S. 658 (1978). The conduct of a city employee deemed to be a "decision maker" will support a claim against the municipality, as the conduct of decision-makers is deemed to represent official municipal policy. <u>Pembaur v. City of Cincinnati</u>, 475

27

U.S. 469, 482 (1986); City of St. Louis v. Praprotnik, 485 U.S. 112 (1988); DeGuiseppe v. Village of Bellwood, 68 F.3d 187 (7th Cir. 1995). A single act of a municipal policy maker can establish municipal policy. Pembaur , 475 U.S. at 482.

It is a question of state, not federal, law whether an individual is a policy maker. Pembaur, 475 U.S. at 482; Auriemma v. Rice, 957 F.2d 397, 399-400 (7th Cir. 1992); Horwitz v. Bd. of Educ., 260 F.3d 602, 619 (7th Cir. 2001). The Pembaur Court emphasized that municipal liability requires more delegation by the municipality of policy making authority to an employee; that employee's policy-making authority must be final. Pembaur, 475 U.S. at 483.

In Gernetzke v. Kenosha Unified School Dist., 274 F.3d 464 (7th Cir. 2001), the Court rejected the proposition that a high school principle was a final decisionmaker for the school district. The Seventh Circuit first noted:

> It doesn't matter what *form* the action of the responsible authority that injures the plaintiff takes. It might be an ordinance, a regulation, an executive policy, or an executive act (such as firing the plaintiff). The question is whether the promulgator, or the actor, as the case may be-in other words, the decisionmaker-was at the apex of authority for the action in question.

Id. at 468. The Court found that a contrary decision would "collapse direct and derivative liability" because every municipal employee has some amount of "final" authority that his employer has delegated to him. Id. That "ordinary sense" of the word "final" does not apply under section 1983. Rather, section 1983 imposes liability only when the "official who commits the alleged violation of the plaintiff's rights has authority that is final in the *special* sense that there is no higher authority." Id.

The City refers to its Code[10], which establishes various departments, including the Department

---

[10]Defendants did not provide a copy of the cited sections of the City's Code. The Code in its entirety is available on line through a link ("I want to get...") found at the City's home page, http://ci.peoria.il.us/city-laws-and-codes.

of Human Resources, and department heads, including the Human Resources Director. Section 2-101. The Code goes on to state:

> The heads of departments enumerated in section 2-101 shall be immediately responsible to the city manager or his delegate for the effective administration of their respective departments and all activities assigned thereto. The city manager may set aside any action taken by any department head and may supersede him in the functions of his office.

Section 2-103.

It is apparent from the City's code that Parsons does not have the special final authority that is required to impute his acts to the City. Everything he does is subject to review and reversal.

Relying on the facts of <u>Pembaur</u>, Plaintiff argues that a subordinate employee may become a policy making official by means of delegation of final authority by the actual policy maker to another employee who then took the actions in question. In <u>Pembaur</u>, for example, the defendants were deputy sheriffs who were unsure of the proper course of action in conducting a search. They sought instruction from their supervisor who told them to follow the orders of the County Prosecutor. The Prosecutor in turn commanded the deputy sheriffs to use force in entering the petitioner's clinic. That decision directly caused the violation of Fourth Amendment rights at issue in the case. The City asserted that the County Prosecutor lacked authority to establish municipal policy regarding law enforcement practices because such final policy could only be established by the County Sheriff. The Court found, however, in referring the matter to the County Prosecutor, the Sheriff had delegated his final authority to the County Prosecutor. <u>Id.</u> at 584-5.

There are no similar facts here. There is nothing indicating that the Morans ever brought this matter to the attention of the City Manager. There is no evidence that the City's custom or practice was delegation of final authority to department heads in general or to Parsons in particular. That

29

Parsons' decision was *de facto* final does not mean that his authority was legally the final decision, nor does it mean that the City Manager had delegated his authority. It simply means that he was not asked to step in and review Parsons' action.

A motion for summary judgment requires the responding party to come forward with the evidence it has. As the Seventh Circuit has stated many times, it is the "put up or shut up moment" in litigation. Eberts v. Goderstad, 569 F.3d 757, 767 (7th Cir. 2009), citing cases. Plaintiff has produced no evidence at all regarding municipal policy, custom or practice as it relates to the claims against Parsons. Without such evidence, the Code establishes that Parsons was not a final decision maker. His conduct therefore cannot be attributed to the City.

## SUBSTANTIVE AND PROCEDURAL DUE PROCESS

In paragraph 54 of the complaint, Plaintiffs allege that Parsons violated substantive and procedural rights. Defendants assert that there is nothing to support either claim. Plaintiff has not responded to this argument at all.

Perfunctory and undeveloped arguments are waived. See Finance Investment Co. v. Geberit AG, 165 F.3d 526 (7th Cir. Dec. 23, 1998); Indurante v. Local 705, International Brotherhood of Teamsters, 160 F.3d 364, 366 (7th Cir. 1998); Kauthar SDN BHD v. Sternberg, 149 F.3d 659, 668 (7th Cir. 1998), cert. den., 119 S.Ct. 890 (1999).

The motion for summary judgment as to these claims is accordingly GRANTED.

## CONCLUSION

As stated herein, the motions for summary judgment are granted in part and denied in part. The Fourth Amendment claim for false arrest against Stratton is dismissed. The First Amendment right to petition claim and retaliation claim against Parsons and the City are dismissed. The

Fourteenth Amendment claims for substantive and procedural due process violations are dismissed. The excessive force claims against Stratton and Esser remain for trial.

The final pretrial conference set on July 16th at 10:30 a.m. is cancelled and reset on July 20, 2010, at 1:00 p.m. in person in Peoria. The parties are to bring to that conference an agreed final pretrial order with all attachments required by CDIL LR-16.1F. Motions in limine must be filed no later than July 9, with responses due by July 15.

ENTERED ON July 6, 2010

s/ John A. Gorman

JOHN A. GORMAN
UNITED STATES MAGISTRATE JUDGE